UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GUILDA GUILFORD,                          :
                                          :
        Plaintiff,                        :
                                          :
        v.                                :        CASE NO.  3:17cv1384(DFM)
                                          :
NANCY BERRYHILL,                          :
ACTING COMMISSIONER OF                    :
SOCIAL SECURITY,                          :
                                          :
        Defendant.                        :


RULING AND ORDER

The plaintiff, Guilda Guilford, seeks judicial review pursuant to 42 U.S.C. § 405(g) of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. The plaintiff asks the court to reverse the Commissioner's decision or, alternatively, remand for a rehearing. (Doc. #23.) The Commissioner, in turn, seeks an order affirming the decision. (Doc. #24.) For the reasons set forth below, the plaintiff's motion is denied and the defendant's motion is granted.[1]

I.  Administrative Proceedings

In May 2014, the plaintiff applied for disability insurance benefits alleging that she was disabled as of September 24, 2012

---

[1]This is not a recommended ruling. The parties consented to the jurisdiction of a magistrate judge. (Doc. #18.)

due to "menorrhagia[2], anemia, 4 uterine fibroid tumors, 20 breast adenomas, tachycardia,[3] high blood pressure, severe depression and anxiety." (R. at 183.) Her last date insured is December 31, 2017. Her application was denied initially and upon reconsideration. She requested a hearing before an Administrative Law Judge ("ALJ"). On May 23, 2016, the plaintiff, represented by counsel, testified at the hearing. A vocational expert also testified. On June 20, 2016, the ALJ issued a decision finding that the plaintiff "was not under a disability, as defined in the Social Security Act, from September 24, 2012 through the date of this decision." (R. at 26.) On June 15, 2017, the Appeals Counsel denied review, making the ALJ's decision final. This action followed. On February 2, 2018, the plaintiff filed a motion for reversal or remand and on March 8, 2018, the defendant filed a motion to affirm.

II. <u>Factual Background</u>

The plaintiff, born in 1968, was 44 years old at the time of her alleged onset[4] date of September 24, 2012. She graduated high

---

[2]Menorrhagia refers to "abnormally long, heavy periods." 1 <u>The Gale Encyclopedia of Medicine</u> 1613 (5th ed. 2015).

[3]Tachycardia refers to rapid heartbeat. <u>Stedman's Medical Dictionary</u> 1931 (28th ed. 2006).

[4]The onset date is the first day an individual is disabled as defined in the Social Security Act and the regulations. SSR 83-20, 1983 WL 31249, at *1 (1983).

school and completed two years of college. (R. at 184.) Last employed as a customer service representative, the plaintiff states that she lost this job in September 2012 after she left work to "go to the hospital and get a blood transfusion." (R. at 44.)

A. Medical Evidence

In February 2009, the plaintiff saw Dr. Klein of Shoreline Medical for complaints of fatigue and chest pains on exertion. (R. at 445.) The plaintiff had a history of anemia. Dr. Klein noted that the plaintiff had "normal" menses. Dr. Klein assessed her with hypertension. She was next seen in April 2010 by Dr. Nina Inamdar for ear pain. (R. at 446.)

2012

On September 26, 2012, the plaintiff was seen for complaints of backache, bodyache and fatigue. (R. at 272.) Blood work indicated that her hemoglobin was 4.7.[5] The next day, the plaintiff presented to the Bridgeport Hospital with complaints of feeling lightheaded for the past week, requiring time off from work. (R. at 366.) She also reported sinus congestion, headaches, and increased urinary frequency. Notes states that the plaintiff has a "long history of iron deficient anemia initially secondary to

---

[5]The normal range for hemoglobin for women is 12 to 16.5 grams per deciliter. 2 The Gale Encyclopedia of Medicine 1259 (5th ed. 2015).

heavy menses and now in combination with a vegetarian diet." (R. at 367.) She did not take recommended "iron treatments" because she was concerned about side effects of constipation and/or diarrhea. (R. at 366.) The plaintiff reported that her menses were regular, occurring every 28 days and lasting approximately 4 days. She had had heavy menses in the past but this "changed after she lost weight." (R. at 366.) The plaintiff explained that she had followed a strict diet to lose 60 pounds and stopped eating meat. The plaintiff was given a transfusion. She was assessed with severe symptomatic anemia with reactive thrombosis. (R. at 367.) She also was noted as tachycardic which was thought to be due to her anemia. (R. at 367.)

On September 29, 2012, the plaintiff had a hematology consultation. (R. at 292.) She explained that she discontinued iron therapy because of her concern regarding side effects. She also stated that although physicians had recommended she take birth control medication to address her heavy menses, she elected not do so. The plaintiff was given intravenous iron. (R. at 294.)

On October 11, 2012, the plaintiff was seen by internist Dr. Nina Inamdar of Shoreline Medical. The plaintiff reported that she was anxious and stressed over losing her job but declined treatment for anxiety. Dr. Inamdar prescribed Atenolol, a beta blocker, for the plaintiff's hypertension.

The next medical record is dated more than a year later.

On October 31, 2013, the plaintiff went to the emergency room after hitting her head. (R. at 337.) She denied loss of consciousness. She reported a history of anemia. She stated that her menses "usually lasts 5 days with the heaviest day [being] day 2." (R. at 361.) She was alert, oriented, and had normal strength. Her hemoglobin was 3.2. Her anemia was thought to be due to menses and diet. The plaintiff was admitted to the hospital and given blood transfusions and an iron infusion. After the treatments, she reported "feeling much better" and denied any fatigue. Hormonal therapy was recommended to address her menorrhagia. (R. at 362.) She left the hospital against medical advice. (R. at 365.)

A CAT scan of the plaintiff's abdomen showed "multiple uterine masses which may represent large necrotic fibroids," ovarian cysts, multiple large gallstones, splenomegaly,[6] multiple breast nodules, and a small right pleural effusion." (R. at 416.)

On December 5, 2013, the plaintiff was seen by Dr. Inamdar. (R. at 263.) She denied chest pain, dyspnea, fatigue, and palpitations. Dr. Inamdar's notes state "negative" for depression, syncope, bone pain, joint pain and weakness. (R. at 264.) Dr. Inamdar noted that the plaintiff's hypertension was

---

[6]Splenomegaly refers to an enlarged spleen. Stedman's Medical Dictionary 1811 (28th ed. 2006).

poorly controlled.  She renewed the prescription for Atenolol and prescribed hydrochlorothiazide, a diuretic.  When Dr. Inamdar saw the plaintiff a few weeks, the plaintiff's hypertension had improved.  (R. at 266.)

2014

In January 2014, a bilateral breast ultrasound revealed "multiple circumscribed ovoid structures" that appeared benign and "likely represent[ed] fibroadenomas."[7]  (R. at 404.)  The plaintiff was told to follow up in six months.  (R. at 406.)

On February 20, 2014, the plaintiff had a gynecological appointment with Wilheelmina Thomas-Jackson, a certified nurse midwife ("CRN").  (R. at 611.)  The plaintiff reported that she was taking an iron supplement daily as directed and that her last hemoglobin was 9.  CRN Thomas-Jackson discussed options for treating the plaintiff's menorrhagia.  The plaintiff declined hormonal medication due to weight gain concerns but expressed interest in an embolization treatment.  (R. at 611.)

On March 12, 2014, Dr. Inamdar completed a Medical Source Statement for the State of Connecticut Department of Social Services.  (R. at 313.)  On the one page form, Dr. Inamdar listed the plaintiff's conditions as severe chronic anemia, menorrhagia,

---

[7]Breast fibroadenomas are benign growths of glandular and fibrous tissues.  3 The Gale Encyclopedia of Medicine 1613 (5th ed. 2015).

fibroid tumors, and fibroadenomas. (R. at 313.) Dr. Inamdar checked a box on the form indicating that the conditions prevented the plaintiff from working for "6 months or more." Dr. Inamdar also indicated that the plaintiff did not have a mental health problem. (R. at 313.)

On September 2, 2014, the plaintiff underwent a consultative physical examination by Dr. Joseph Guaranaccia. (R. at 314-17.) The plaintiff told him that her menses lasted 10 days, during which she experienced severe bleeding. She also said that her breast fibroadenomas caused her "severe pain in her chest" and that the medication she took for hypertension caused fatigue and lightheadness. (R. at 314.)

Upon examination, Dr. Guaranaccia noted that the plaintiff's affect was normal and that she was not anxious. He remarked that she was a "good historian." (R. at 316.) Her physical examination was unremarkable. Under the "Assessment" section of his report, Dr. Guaranaccia stated:

> 46 year old woman with heavy menses due to fibroid tumors, and discomfort due to breast tumors. Until these issues are resolved she is limited in her ability to be consistent in a work setting.

(R. at 317.)

State agency physician Dr. Jeanne Kuslis reviewed the plaintiff's medical records and completed a physical residual functional capacity assessment. Dr. Kuslis determined that the

plaintiff could frequently lift and/or carry 20 pounds; occasionally lift and/or carry 10 pounds; stand and/or walk 6 hours in an 8 day; and sit 6 hours in an 8 hour day. (R. at 61.)

On September 17, 2014, the plaintiff underwent a consultative psychological examination by Dr. Dana Martinez. The plaintiff reported difficulty sleeping "due to frequent urination as a result of water pills and a tumor pressing on her bladder." She stated that "when she has her menses she is literally awake for two days straight since it requires so much care due to the heavy bleeding." (R. at 320.) She reported anxiety, panic attacks, and depression.

Dr. Martinez observed that the plaintiff was well spoken and that her speech was clear and organized. She was oriented to date, time and person. The plaintiff's affect was sad and she disclosed current suicidal ideation due to her financial stressors and illness. She denied auditory and visual hallucinations and Dr. Martinez saw no evidence of delusional ideation. Dr. Martinez assessed the plaintiff's "insight and introspective abilities" as "good." Her attention was good and her "effort and concentration" were "very good." (R. at 320.) Dr. Martinez noted that the plaintiff "appeared to be intently focus[ed] and "attempting to do as well as possible." The plaintiff was able to recall three out of four words after fifteen minutes.

Dr. Martinez's diagnostic impressions were Major Depressive Disorder, severe, single episode; Generalized Anxiety Disorder;

and Panic Disorder. (R. at 320.) According to Dr. Martinez, the plaintiff "will require direction to needed social services and monitoring to ensure attendance." Dr. Martinez stated that the plaintiff "would benefit" from therapy and a "psychiatric evaluation to determine if medication would ameliorate" her symptoms. (R. at 320.)

On September 30, 2014, State agency physician Dr. Warren Lieb reviewed the plaintiff's medical record. Dr. Lieb found that the plaintiff had no restrictions in the activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episode of decompensation. (R. at 60.)

In October 2014, State agency consultant Russell Phillips, Ph.D, completed a mental residual functional capacity assessment. Dr. Phillips found that the plaintiff had no significant limitations in her ability to: carry out very short and simple instructions; carry out detailed instructions; and sustain an ordinary routine without special supervision. The plaintiff was "moderately limited" in her ability to: maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. Dr. Phillips opined that the plaintiff could

"maintain attention for two hours at a time and persist at simple tasks over eight and forty hour periods with normal supervision." (R. at 78.) He further found that the plaintiff could "tolerate the minimum social demands of simple-task settings" but not "sustained contact with the general public." (R. at 79.) Dr. Phillips stated that the plaintiff was "able to persist at simple, repetitive tasks over time under ordinary conditions." (R. at 79.)

The plaintiff had a consultation with Dr. Richard Garvey, a surgeon, on October 22, 2014 regarding the "[m]ultiple masses" in her breasts. (R. at 327.) The plaintiff reported that she was taking iron supplements and felt better. Her examination was unremarkable. (R. at 328.)

In November 2014, the plaintiff began individual therapy with Jennifer Lockshier, a licensed clinical social worker ("LCSW"). She treated with LCSW Lockshier through September 2015.

On November 20, 2014, the plaintiff was seen by Dr. Dorothy Zachmann, a psychiatrist, at the Bridgeport Hospital Intensive Outpatient Program. (R. at 324.) The plaintiff was noted as having "significant mood instability." Dr. Zachmann observed that the plaintiff's impulse control was impaired; her mood was "discouraged, irritable and depressed"; and her affect was labile. The plaintiff's speech was normal and her thought process was organized and coherent. She was oriented, her attention and concentration were normal, and her judgment was good. She had

limited insight into her illness.  Dr. Zachmann diagnosed the plaintiff with "bipolar I disorder depressed and panic disorder." (R. at 326.)  The plaintiff was prescribed Abilify.[8]  (R. at 327.)

When seen on December 8, 2014, LCSW Lockshier observed that the plaintiff's mood and affect were improved.  The plaintiff reported that she was taking medication.  On December 11, 2014, the plaintiff reported that she was part of a "paid focus group." (R. at 674.)  She said she felt better and wanted to return to work. (R. at 674.)  On December 23, 2014, the plaintiff indicated she had stopped taking her medication.  She presented with blunted affect and depressed mood. (R. at 672.)  The plaintiff "express[ed] difficulty" with Dr. Zachmann's diagnosis of bipolar and felt that "maybe she could use it as an excuse."  She indicated she planned on moving to Bridgeport and was "uncertain where to find a job because she does not want a long commute."  (R. at 672.)

2015

On January 8, 2015, the plaintiff told LCSW Lockshier that her living situation was stressful and she planned to move shortly. She expressed uncertainty about getting a job due to her health issues.  She "is uncertain and feels that she is an unreliable employee and should maybe not work."  LCSW Lockshier noted that

---

[8]Abilify is an atypical antipsychotic used in the treatment of schizophrenia, psychosis, and depression.  Physicians' Desk Reference S2 (71st ed. 2017).

despite recommendations, the plaintiff was not seeking treatment for her medical issues. (R. at 670.) The next week, the plaintiff stated that she felt "unprepared to go to work" due to her medical issues. She was concerned that she "will be unreliable and they will fire her so why [should she] even try." (R. at 669.) LCSW Lockshier recommended a higher level of care. In February, the plaintiff continued to present with a blunted affect and depressed mood. In March 2015, the plaintiff expressed anger at her family for their lack of support. She expressed feeling "conflicted" about not being married with children. (R. at 661.)

In a letter to plaintiff's counsel dated March 31, 2015, LCSW Lockshier stated that she had seen the plaintiff since November 2014. The plaintiff had presented with "symptoms consistent with panic attacks when in public." LCSW Lockshier stated that the plaintiff suffered from uterine fibroids and anemia, which "contribute to her feelings that she will be unsuccessful in the workplace. She was residing with one of her sisters with the hope that she could be able to work soon." LCSW Lockshier further stated that the plaintiff

> attend[ed] weekly sessions for psychotherapy to address the issues she has been experiencing. The sessions were increased to twice weekly for several weeks when she reached a critical phase and was more acute. The recommendation has been made to begin a higher level of care with the possibility of psychotropic intervention to address her depression and feelings of suicidality. An appointment to Intensive Outpatient Services (IOP) [at] Bridgeport Hospital REACH was made. Her symptoms

12

and these feelings most certainly inhibited her ability to work.  She was unable to commit to the requirements of the IOP due to multiple reasons, including [that she moved].  They had prescribed two medications, however, client felt uncomfortable taking the medication due to side effects and that she was not feeling that they will be effective.

Client remains in a time of transition and has been essentially homeless.  She resided with a sister in Bridgeport but moved in with her niece in Darien due to family obligations and an argument with the Bridgeport sister.  Her Darien sister has indicated that she will need to move out of the home very soon.  Referrals and recommendations have been made to outpatient community resources to assist her in becoming more stable and to address her basic needs.

It is apparent that [the plaintiff] has been declining emotionally over the past few years.  She has insight into her mental health but has poor judgment on how to overcome these obstacles and barriers in her life. Her coping skills have worsened since losing her job and she had become more socially isolated. Her social supports have been more limited and certainly less supportive of her now that she is [in] need of [] assistance.  Her overall mood is generally depressed with anxious distress.  Her affect is flat and her appearance is well groomed.  No known hallucinations or delusions have been identified.

Her current diagnosis in DSM V format is Major Depressive Disorder, Recurrent Episode, Moderate with Anxious Distress.  There is strong consideration that she may meet the criteria of Bipolar I Disorder but at this point and under careful consideration and assessment she has not fully met the criteria.

(R. at 440-41.)

In her April 2015 session with LCSW Lockshier, the plaintiff presented with a blunted affect and a depressed, anxious mood. The plaintiff stated that she did not go to her primary care physician for healthcare treatment because she did not have

13

transportation and because it was raining.  LCSW Lockshier told
the plaintiff she was putting up "blockades" and holding "herself
back."  (R. at 658.)  On April 15, 2015, the plaintiff told LCSW
Lockshier that she had a job interview the next day but was not
going to go due to transportation issues.  The therapist observed
that the plaintiff "continued to vacillate on her goals."  (R. at
656.)  In a subsequent session, the plaintiff "talked about her
boredom and how she comes to treatment to vent."  Notes state that
the plaintiff "vacillates between physical and mental health
issues on why she can't work but is not making strides to change
things."  (R. at 653.)

In May 2015, the plaintiff told LCSW Lockshier that she wanted
to move out of her sister's home and was considering "going to the
Bridgeport Hospital ER" for an evaluation of her anemia.  "She is
considering this as a plan she can manipulate to get good food,
housing and a referral to [a] shelter[]."  (R. at 652.)  In June
2015, the plaintiff presented in an irritable, defensive mood.
Notes state that she continues to "waver" on whether to take
medication.  (R. at 647.)  The plaintiff subsequently said that
the fact that LCSW Lockshier was in a "settled life" as compared
to her own "made her feel badly."  (R. at 645.)  July notes state
that the plaintiff "vacillates between her thoughts about if she
should work and how she can't because of her menstrual cycle."
(R. at 643.)  She reported that she thought her "iron level" was

low but was not going to go to the doctor.  (R. at 641.)  LCSW
Lockshier questioned the plaintiff's desire and motivation for
change.  (R. at 640.)

In July 2015, the plaintiff presented at Bridgeport Hospital
for medication management.  (R. at 589.)  She stated that she had
been argumentative with her therapist who recommended that she be
seen for treatment.  She indicated difficulty getting out of the
house, mood swings, and decreased motivation.  She also reported
passive suicidal thoughts such as "why are you still living, you
are not productive" but denied any attempt.  She said that she
"sometimes feels like hitting her niece with a pan to knock her
out of her stupidity."  APRN Katherina Bajda noted that the
plaintiff's attention and concentration were good and that she was
cooperative, although somewhat guarded.  The plaintiff was
oriented, her speech was normal, her thought process was organized
and associations were normal.  Her memory was intact. She had
passive suicidal thoughts but denied that she would ever act on
them and her risk level was assessed as low.  (R. at 594-95.)  Her
impulse control and judgment were poor and her insight into her
illness was limited.  (R. at 595.)  APRN Bajda thought that the
plaintiff "appears to struggle with her anger and mood."  The
plaintiff was prescribed Abilify.

LCSW Lockshier subsequently noted that the plaintiff was resistant to taking the medication because she was concerned about side effects. (R. at 639.)

When the plaintiff seen by Dr. Inamdar on August 6, 2015, the plaintiff's hypertension was stable. (R. at 460.) Dr. Inambar noted that the plaintiff was not compliant with her iron supplements and had not followed up with her gynecologist regarding her uterine fibroids. The plaintiff reported depression and indicated that functioning was "somewhat difficult." (R. at 460.) She presented with "depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure" but denied anxious/fearful thoughts, fatigue, loss of appetite, restlessness, irritability, and suicidal thoughts. (R. at 460.)

On August 26, 2015, LCSW Lockshier noted that the plaintiff had "a fair amount of energy" and reported that her depression had "improved." She was not taking Abilify. (R. at 636.)

In September 2015, the plaintiff stopped treating with LCSW Lockshier because she wanted treatment closer to her residence. (R. at 621.)

In December 2015, the plaintiff sought treatment for depression at St Vincent's Intensive Outpatient Program. (R. at 515.) She reported "feeling more down and depressed over the past few years." (R. at 522.) She explained that she had lost her job in 2012 and "[t]hroughout 2013, she was looking for employment"

but was unsuccessful. (R. at 522.) Her difficulty in finding work "contributed to her increased depression to the point where she was virtually unable to get out of bed and was isolating." (R. at 522.) She denied any suicidal ideation. (R. at 522.) Dr. Gianetti observed that the plaintiff was neat, appropriate, and oriented. Her recent and remote memory was "adequate." There was no evidence of thought disorder. (R. at 523.) Her insight and judgment were fair. Dr. Gianetti prescribed Abilify. (R. at 524.)

On January 13, 2016, she was admitted to St. Vincent's Behavioral Health Services after she expressed suicidal ideation by taking an overdose of her hypertension medication. The plaintiff stated "I don't know why I'm here to be honest" and explained that her statement was "misconstrued - she never was suicidal." (R. at 517, 519.) She acknowledged "feeling depressed but mostly she says she is bored." (R. at 517.) She "denie[d] that she is isolative, rather she has no money to do things." (R. at 521.) She was oriented, "interacted on approach with staff," had intact memory and concentration and was cooperative but guarded. (R. at 520.) Her insight and judgment were fair. (R. at 521.) She described her mood as "bored" and "complain[ed] that she has no money to do things." (R. at 521.) She denied any psychotic symptoms and denied any past suicide attempts. She reported impaired sleep and "feeling ups and downs" but denied "any euphoria or mania." (R. at 517.)

Dr. Surapaneni, a psychiatrist, noted that the plaintiff was cooperative and appropriate. Her personal grooming and hygiene were good. Her thought process was coherent and goal-directed. She was oriented, her memory was intact for recent and remote events, and her insight and judgment were fair. (R. at 517.) Her mood was depressed. While inpatient, the plaintiff "actively participated" in treatment activities and therapeutic groups. (R. at 517.) Dr. Surapaneni noted that the plaintiff "made progress" and "became stable in her mood as well as her behavior." Her mood improved and she was discharged a few days later. (R. at 518.) Upon discharge, her mood was "fairly stable" and she "did not appear depressed or anxious." (R. at 518.)

Thereafter from January 19, 2016 until February 27, 2016, the plaintiff participated in the Intensive Outpatient Program at St. Vincent's. (R. at 515.) She regularly attended various groups although she was reticent. (R. at 516.) Dr. Magid noted that the plaintiff had "contradictory presentations. [She] reported early in her treatment that she often was not honest and would manipulate others to get what she wanted." She subsequently stated that she wanted to open up more but would not share the specifics of what she wanted to share. When discharged, she was encouraged to continue therapy. (R. at 516.)

In February 2016, she sought care from Catholic Charities Behavioral Health Services. She reported feeling depressed and

worthless. (R. at 575.) On mental status examination, the plaintiff was well groomed and cooperative with normal psychomotor behavior and coherent speech. Her mood was depressed and her affect was flat but appropriate. The plaintiff's thought process was normal, she was fully oriented, and her judgment and impulse control were good. (R. at 580.) She had no memory impairment. The plaintiff was diagnosed with "Major Depressive Disorder, Moderate." (R. at 574.)

In March 2016, therapist Inger Sjogren at Catholic Charities completed a "Medical Opinion Questionnaire (Mental Impairments)." (R. at 566.) She indicated that she had seen the plaintiff seven times from February 23, 2016 to March 22, 2016. (R. at 566.) Therapist Sjogren listed the plaintiff's diagnosis as Major Depressive Disorder and opined that her prognosis was "good/excellent." The form asked the provider to assess the plaintiff as to 25 "Mental Abilities and Aptitude Needed to Do Any Job." Therapist Sjogren found that the plaintiff had a "good" ability to: interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; use public transportation; remember work-like procedures; understand and remember very short/simple instructions; carry out very short/simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to

others without being unduly distracted; make simple work related decisions; ask simple questions/request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; and carry out detailed instructions.

Therapist Sjogren found that the plaintiff had a "fair" ability to: maintain attention for two hours segments; maintain a regular attendance and be punctual within customary, usually strict, tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an reasonable number and length of rest periods; understand and remember detailed instructions; set realistic goals or make plans independently of others; and deal with stress of skilled or semi-skilled work. Finally, therapist Sjogren opined that the plaintiff would be absent from work twice per month. (R. at 568.)

B.    Plaintiff's Testimony

At the hearing, the plaintiff testified that she last worked in September 2012 as a customer support representative. She was fired when she left work to have a blood transfusion. She

subsequently received unemployment compensation and looked for another customer service position.  (R. at 44.)

The plaintiff testified that she is unable to work due to menorrhagia.  She said that her menstrual cycle "lasts like three weeks."  The plaintiff also testified that she suffers from severe anemia.  She had a blood transfusion in 2012 and 2013 but none since.  She explained that she is taking "a very strong iron pill which is maintaining [her]", although "at a low level."  (R. at 48.)  As a result of her anemia, she is "tired all the time."  (R. at 48.)

She has uterine fibroids that "press against [her] back" and as a result she "can't sit or stand for long periods of time." (R. at 47.)  She also suffers from bipolar disorder and major depression.

The plaintiff can engage in personal care "when not severely depressed."  (R. at 46.)  She is unable to cook or clean "because of the anemia." (R. at 46.)  She has a driver's license and drives to therapy twice a week.  She stays "in bed most of the time" because she is depressed.  (R. at 47.)

III. Statutory Framework

The Commissioner uses the following five-step procedure to evaluate disability claims[9]:

---

[9]To be "disabled" under the Social Security Act and therefore entitled to benefits, a claimant must demonstrate an "inability to

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (internal alterations and citation omitted). "The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

IV.  The ALJ's Decision

Following the five step evaluation process, the ALJ first found that the plaintiff had not engaged in substantial gainful activity since September 24, 2012, her alleged onset date. (R. at 18.)  At step two, the ALJ determined that the plaintiff had severe

---

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

impairments of anemia, uterine fibroids, depressive disorder, and bipolar disorder. (R. at 18.) At step three, the ALJ found that the plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpart P, Appendix 1. (R. at 19.) The ALJ next determined that the plaintiff had

> the residual functional capacity[10] to perform light work[11] as defined in 20 CFR § 404.1567(b) except that she can never climb ladders, ropes or scaffolds. She can occasionally climb stairs and ramps as well as balance, stoop and crouch. She can never kneel or crawl. The claimant can frequently handle and there are no fingering limitations. The claimant should not work in exposure to temperature extreme or wetness. The claimant can perform simple routine and repetitive tasks. She can sustain concentration, persistence and pace for two-hour segments. The claimant is limited to brief and superficial interaction with co-workers and supervisors but should not interact with the public. The claimant should not perform any work that requires independent judgment making (no setting work duties/schedules for others, no responsibility for the safety of others). The claimant is limited to work that has little to no change in work duties.

(R. at 20.)

At step four, the ALJ concluded that the plaintiff was not capable of performing her past relevant work. (R. at 25.) At step five, after considering plaintiff's age, education, work

---

[10]A claimant's residual functional capacity is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a)(1).

[11]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b).

experience and RFC, as well as the testimony of a VE, the ALJ found that the plaintiff could perform the jobs of cleaner (DOT code 323.687-014), price marker (DOT code 209.587-034), and mail sorter (DOT code 222.687-022). (R. at 26.) Accordingly, the ALJ determined that the plaintiff was "not under a disability, as defined in the Social Security Act, from September 24, 2012, through the date of this decision [June 20, 2016]." (R. at 26.)

V.    Standard of Review

This court's review of the ALJ's decision is limited.  "It is not [the court's] function to determine de novo whether [the plaintiff] is disabled." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996).  The court may reverse an ALJ's finding that a plaintiff is not disabled only if the ALJ applied the incorrect legal standards or if the decision is not supported by substantial evidence. Brault v. Soc. Sec. Admin., 683 F.3d 443, 447 (2d Cir. 2012).  "Substantial evidence is more than a mere scintilla. . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447 (quotation marks and citations omitted).  It is "a very deferential standard of review — even more so than the clearly erroneous standard. . . . The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 447–48.  See also Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)

("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.") (internal quotation marks omitted).

## VI.  Discussion

The plaintiff argues that the ALJ erred in weighing the medical opinion evidence and in determining her residual functional capacity.

## A.  Medical Opinion Evidence

The plaintiff first argues that the ALJ erred in assessing the opinion of the plaintiff's primary care physician, Dr. Inamdar.

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Greek v. Colvin, 802 F.3d 370, 375-76 (2d Cir. 2015).  When a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.  Greek, 802 F.3d at 375.  "The Second Circuit does not require a 'slavish recitation of each and

every factor [of 20 C.F.R. § 404.1527(c)] where the ALJ's reasoning and adherence to the regulation are clear." Whitley v. Colvin, No. 3:17CV00121(SALM), 2018 WL 1026849, at *13 (D. Conn. Feb. 23, 2018)(citing Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013)).   The ALJ must provide "good reasons" for the weight assigned to a treating physician's opinion.   Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008).

In March 2014, Dr. Inamdar completed a Medical Source Statement.  (R. at 313.)  On the one page form, Dr. Inamdar listed the plaintiff's conditions as "severe chronic anemia, menorrhagia, fibroid tumors, and fibroid adenomas."  (R. at 313.)  Dr. Inamdar checked a box indicating that the conditions prevented the plaintiff from working for "6 months or more."  (R. at 313.)

The ALJ discussed and considered Dr. Inambar's statement. The ALJ afforded it "little weight" because it was "conclusory" and "not supported by the evidence in the record."  (R. at 22.)

On appeal, the plaintiff argues that the ALJ erred because Dr. Inambar's opinion is "extensively supported by the record." (R. at 19.)  In support, the plaintiff points to Dr. Guarnaccia's assessment that due to "heavy menses" the plaintiff was "limited in her ability to be consistent in a work-related setting."

The ALJ carefully reviewed and considered the medical evidence and the consistency of Dr. Inambar's opinion with the medical evidence of record.   The ALJ noted that the plaintiff

received a transfusion in September 2012 and another a year later in 2013. The only treatment thereafter for her anemia was iron supplements. When seen in October 2014, the plaintiff stated that she was taking her iron supplements and was feeling better. As for her uterine fibroids and breast adenomas, the record reflects no treatment. The record reflects no functional limitations. The ALJ further observed that the results of Dr. Guarnaccia's physical examination were essentially normal. As to Dr. Guarnaccia's assessment about the plaintiff's ability to be "consistent" during her menstrual cycle, the ALJ noted that this was unsupported by exam findings. (R. at 22.) On this record, substantial evidence supports the ALJ's decision as to the weight accorded to Dr. Inambar's opinion.

LCSW Lockshier

The plaintiff next contends that the ALJ should have accorded the LCSW Lockshier's opinion greater weight because "no treating source has disagreed with it" and because "it was consistent with other evidence in the record." (Doc. #23 at 21.)

LCSW Lockshier stated in pertinent part that

> [The plaintiff's] symptoms and these feelings most certainly inhibited her ability to work. She was unable to commit to the requirements of the IOP due to multiple reasons, including [that she moved]. They had prescribed two medications, however, client felt uncomfortable taking the medication due to side effects and that she was feeling that will not be effective.
> * * *

It is apparent that [the plaintiff] has been declining emotionally over the past few years. She has insight into her mental health but has poor judgment on how to overcome these obstacles and barriers in her life. Her coping skills have worsened since losing her job and she had become more socially isolated. Her social supports have been more limited and certainly less supportive of her now that she is [in] need of [] assistance. Her overall mood is generally depressed with anxious distress. Her affect is flat and her appearance is well groomed. No known hallucinations or delusions have been identified.[12]

(R. at 440-41.)

In his decision, the ALJ acknowledged LCSW Lockshier's treatment relationship but afforded her opinion "little weight" because it "fail[ed] to provide any functional limitations." (R. at 23.)

"[L]icensed clinical social workers are not considered acceptable 'medical sources' pursuant to 20 C.F.R. § 416.913(a), and their opinions are not entitled to controlling weight." Cowley v. Berryhill, 312 F. Supp. 3d 381, 383 (W.D.N.Y. 2018). "The amount of weight given to such opinions is based, in part, on the examining and treatment relationship, length and frequency of examinations, the extent of relevant evidence given to support the opinion, and consistency of the opinion with the record as a whole. 20 C.F.R. § 416.927(c)." Id. However, the ALJ is "free to decide

---

[12]The plaintiff asserts that Lockshier "described [plaintiff'] symptoms and diagnosis as well as the prognosis that [the plaintiff's] condition prevents her from working." (Doc. #23 at 21.) A careful reading of LCSW Lockshier's opinion does not indicate that she opined that the plaintiff's mental health issues precluded her from working.

that the opinions of other sources . . . are entitled to no weight
or little weight, [though] those decisions should be explained."
Id. (internal quotation marks and citations omitted.) See Mideczky
v. Colvin, No. 5:15-CV-0531(GTS), 2016 WL 4402031, at *8 (N.D.N.Y.
Aug. 18, 2016)(An opinion from a therapist "is not entitled to any
particular weight under the regulations.")

The ALJ did not err.  The ALJ considered LCSW Lockshier's
opinion and sufficiently explained his reasons for the weight he
assigned to it.  See Sanchez v. Berryhill, No. 16CV07775 (PGG)
(DF), 2018 WL 1472687, at *20 (S.D.N.Y. Feb. 28, 2018) (ALJ did
not err in affording no weight to report from social worker where,
inter alia, it failed to "assess the severity of the impairments");
Smith v. Astrue, 896 F. Supp. 2d 163, 178 (N.D.N.Y. 2012) (the ALJ
did not err in declining to accord weight to physical therapist's
records where they "do not set forth any professional opinion
regarding plaintiff's limitations"); Alpajon v. Comm'r of Soc.
Sec., No. 1:13-CV-617, 2014 WL 4626012, at *15 (S.D. Ohio Sept.
11, 2014)(ALJ did not err in affording "little weight" to
therapist's opinion's where, inter alia, it "provided no specific
functional limitations").

Therapist Sjogren

The plaintiff next argues that the ALJ should have credited
therapist Sjogren's opinion that the plaintiff would be absent
twice per month. (Doc. #23 at 22.)

Therapist Sjogren opined that the plaintiff had good mental abilities and aptitude needed to do any job with only a fair ability in some areas related to detailed work and attendance. She also stated that the plaintiff would be absent twice a month.

The ALJ accorded therapist Sjogren's opinion "very limited weight," explaining there were no underlying treatment notes to support her opinion.

The ALJ did not err in failing to credit therapist Sjogren's opinion that the plaintiff would be absent twice a month as it was unsupported by any evidence in the record. "It is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole" Banks v. Astrue, 955 F. Supp. 2d 178, 188 (W.D.N.Y. 2013). See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)("Genuine conflicts in the medical evidence are for the Commissioner to resolve.")

State Agency Physicians

The plaintiff next argues that the ALJ erred in according "great weight" to the assessments of state agency physicians, Drs. Lieb and Phillips.

Upon reviewing the plaintiff's medical record, Dr. Lieb determined that the plaintiff had no restrictions in the activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration,

persistence or pace; and no repeated episode of decompensation. (R. at 60.)

Subsequent to Dr. Lieb's assessment, Dr. Phillips completed a mental residual functional capacity assessment. Dr. Phillips found that the plaintiff had no significant limitations in her ability to: carry out very short and simple instructions; carry out detailed instructions; and sustain an ordinary routine without special supervision. The plaintiff was "moderately limited" in her ability to: maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. Dr. Phillips opined that the plaintiff could "maintain attention for two hours at a time and persist at simple tasks over eight and forty hour periods with normal supervision." (R. at 78.) He further found that the plaintiff could "tolerate the minimum social demand of simple-task settings" but not "sustained contact with the general public." (R. at 79.) Dr. Phillips opined that the plaintiff was "able to persist at simple, repetitive tasks over time under ordinary conditions." (R. at 79.)

The plaintiff contends that the ALJ erred in assigning "great weight" to these opinions because they are contradicted by those of Dr. Inambar, Lockshier and Sjogren.

31

"[T]he opinions of non-examining sources, when supported by sufficient medical evidence in the record, can override the opinion of treating sources and be given significant weight." Montaldo v. Astrue, No. 10 Civ. 6163, 2012 WL 893186, at *14 (S.D.N.Y. Mar. 15, 2012); see also Wells v. Comm'r of Social Security, 338 Fed. Appx. 64, 66 (2d Cir. 2009) (ALJ did not err by relying on assessment of non-examining source of individual's functional capacity). State agency medical consultants "are highly qualified physicians ... who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i).

The ALJ did not err as to the weight he assigned these opinions because they are supported by the weight of the record evidence. The plaintiff reported that she was independent in her activities of daily living, shopped for groceries (r. 195), prepared meals (r. at 192), drove herself to therapy (r. at 46), did dishes and light laundry (r. 194) and handled finances. (R. at 195.) She related adequately with authority. (R. at 196.) The plaintiff's treaters noted intact memory and concentration. (R. at 326, 520, 517, 544.) The record reflects an absence of significant psychologically based functional limitations beyond those found by Drs. Lieb and Russell. "It is well established that the opinions even of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the

record." <u>Camille v. Berryhill</u>, No. 3:17CV01283(SALM), 2018 WL 3599736, at *13 (D. Conn. July 27, 2018)(quotation marks and citations omitted). As noted by the ALJ, the opinions of Dr. Lieb and Dr. Phillip are consistent with the record as a whole. Remand is not merited on this basis.

B.   <u>Residual Functional Capacity</u>

The plaintiff's final argument is that the RFC is unsupported by substantial evidence and that the ALJ should have included additional limitations.

The plaintiff bears "the burden of proving her RFC." <u>Kallfelz v. Comm'r of Soc. Sec.</u>, No. 3:15CV1494(DFM), 2017 WL 1217089, at *3 (D. Conn. Mar. 31, 2017). "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). In assessing a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including a claimant's mental impairments. <u>Id.</u> § 404.1545(a)(3), (4). An ALJ's RFC determination must be supported by substantial evidence in the record. <u>See</u> 42 U.S.C. § 405(g). If it is, that determination is

conclusive and must be affirmed upon judicial review. See id.;

Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Here, the ALJ found that the plaintiff

> can perform simple routine and repetitive tasks. She can
> sustain concentration, persistence and pace for two-hour
> segments.   The claimant is limited to brief and
> superficial interaction with coworkers and supervisors
> but should not interact with the public.   The claimant
> should not perform any work that requires independent
> judgment making (no setting work duties/schedules for
> others, no responsibility for the safety of others).
> The claimant is limited to work that has little to no
> change in work duties.

(R. at 20.)

The plaintiff first argues that the RFC fails to account for
the fact that she has "angry outbursts and an inability to engage."
(Doc. #23 at 25.)

The plaintiff's argument is without merit.   The record
reflects that the plaintiff stated that she gets along "ok" with
authority figure, has "no problems" getting along with others, and
had never been terminated because of problems getting along with
other people.  (R. at 196-97.)  While in the Intensive Outpatient
Program, the plaintiff "attended groups regularly" without
incident although she was reticent. (R. at 515.)  She "interacted
on approach with staff," and was cooperative but guarded.  (R. at
520.)  To the extent that the plaintiff had difficulties with
social interaction, the ALJ accommodate those by including

limitations found by Dr. Russell in fashioning the RFC that limited her exposure.

The plaintiff also posits that the RFC is not supported by substantial evidence because it fails to account for the fact that she "cannot sustain concentration and attention in two hour segments and would incur excessive absences." (Doc. #23 at 25.) She contends that the ALJ failed to recognize that the plaintiff would be off task due to fatigue, lightheadedness, weakness and impaired concentration "arising from her anemia and from her mental illness." (Doc. #23 at 26-27.)

The ALJ properly addressed the impact of the plaintiff's non-exertional limitations in formulating the RFC. In reaching his RFC determination, the ALJ extensively discussed the evidence of record, including the plaintiff's statements, medical treatment notes, and opinion evidence. As to the plaintiff's subjective complaints, the ALJ determined that the plaintiff's impairments could reasonably be expected to cause her alleged symptoms. He concluded, however, that her statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record.

The plaintiff's proposed limitations are not supported by the record. Various treaters observed that the plaintiff's concentration was good. Dr. Martinez specifically noted that the

plaintiff's concentration was "very good." (R. at 320.) Dr. Lieb opined that the plaintiff had only "mild" difficulties maintaining concentration, pace and persistence. (R. at 60.) Dr. Phillips found a slightly greater limitation, finding that the plaintiff was "moderately limited" in her ability to maintain attention and concentration for extended periods of time. Providers at the Intensive Outpatient Program assessed her attention and concentration as "good", "normal" and "intact." (R. at 326, 594, 521.) As to her attendance, the only evidence is therapist Sjogren's opinion that the plaintiff would be absent twice a month, which the court has already addressed.

Substantial evidence supports the ALJ's RFC determination. "[I]t is well established that the ALJ has both the ability and the responsibility to resolve conflicts in the evidence and to weigh all of the available evidence 'to make an RFC finding that is consistent with the record as whole.'" Carbee v. Comm'r of Soc. Sec., No. 1:17CV0051(GTS), 2018 WL 333516, at *14 (N.D.N.Y. Jan. 9, 2018) (citing Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013)). The evidence as a whole provides substantial support for the RFC finding.

VII. Conclusion

For these reasons, the plaintiff's motion to reverse and/or remand the Commissioner's decision (doc. #23) is denied and the

defendant's motion to affirm the decision of the Commissioner (doc. #24) is granted.

SO ORDERED at Hartford, Connecticut this 24th day of September, 2018.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge